672 So.2d 530 (1996)
THE FLORIDA BAR, Complainant,
v.
John Lobban MAYNARD, Respondent.
Nos. 83918, 84648.
Supreme Court of Florida.
April 18, 1996.
John F. Harkness, Jr., Executive Director and John T. Berry, Staff Counsel, Tallahassee; and Jan Wichrowski, Bar Counsel and *531 Frances R. Brown, Co-Bar Counsel, Orlando, for Complainant.
Gavin D. Lee of Gavin D. Lee, P.A., Maitland, for Respondent.
PER CURIAM.
We have for review two complaints of The Florida Bar (Bar) against John Lobban Maynard and the referee's report in each case. We have jurisdiction pursuant to article V, section 15 of the Florida Constitution and consolidate the two cases for purposes of this review.

CASE NUMBER 83,918
After a hearing, the referee concluded that Maynard was guilty of three counts of misconduct[1] and made the following findings:

COUNT I
1. Respondent and Randy Strausberg have known each other since 1992. They became very close personal friends, eating dinner at each other's homes, taking vacation trips together and the like. Over the years Respondent handled several legal matters for Strausberg.
2. In 1984, Strausberg hired Respondent to set up an Irrevocable Trust for his two children. Respondent was requested to act as Trustee. While no Trust instrument is known to exist, nevertheless, the parties acknowledged that a Trust was created.
3. Strausberg desired the childrens' Trust be created to remove assets from his personal estate and to establish a fund which could be used for the education of his children and their bar mitzvahs.
4. Strausberg knew he could not dictate which investments the Trustee should consider; however, he believed that Respondent would consider his recommendations. Strausberg had numerous discussions with Respondent concerning what he considered to be good investments and expected Respondent to make prudent investments for the childrens' Trust. He provided Respondent with a letter of November 10, 1994, outlining what he considered to be good investments.
5. Respondent agreed to keep Strausberg advised of the status of the assets in the Trust; however, he failed to do so.
6. In January of 1984, Strausberg funded the subject Trust by delivering Forty-Three Thousand Dollars ($43,000.00) to Respondent, as Trustee. On the 25th of January, 1984, Respondent, as Trustee, loaned from the Trust the sum of Forty-Three Thousand Dollars ($43,000.00) to Eric J. Parker, and as Trustee, took back a mortgage (hereinafter the "Parker Mortgage"). Respondent did not list the initial contribution in any accounting for the Trust. He later testified that he had placed the funds in his general law office Trust Account.
7. On August 31, 1984, Strausberg transferred a mortgage valued at Nine Thousand Dollars ($9,000.00) to the Trust. That mortgage (hereinafter the "Chang Mortgage") was to have brought to the Trust monthly payments of One Hundred Thirty-Three Dollars and Eighteen Cents ($133.18).
8. Respondent received a payment of Nineteen Thousand Four Hundred Ninety-Three Dollars and Thirty-Three Cents ($19,493.33) on the Parker Mortgage on February 11, 1985. He did not account for those funds, however, until August 1985, when he opened a separate money market account for the Trust.
9. In a letter of June 17, 1985, Respondent advised Strausberg that he would open a separate money market account entitled "John L. Maynard, as Trustee," for the Strausberg children, in the amount of Twenty Thousand Five Hundred Thirty-Seven Dollars and Sixty-Three Cents ($20,537.63). That amount included the February 11, 1985, Parker Mortgage payment of Nineteen Thousand Four Hundred Ninety-Three dollars and Thirty-Three Cents ($19,493.33) and payments received on the Chang Mortgage. Respondent did not indicate how many payments on the Chang Mortgage were included in the funds to be deposited and there is no *532 method to determine such, as the Trust records Respondent produced are incomplete. Respondent agreed to send Strausberg monthly statements from that separate account; however, he failed to do so.
10. Respondent failed to deposit the Twenty Thousand Five Hundred Thirty-Seven Dollars and Sixty-Three Cents ($20,537.63) into a separate fund until August 26, 1985, when Respondent deposited the funds in an interest-bearing "money market" account.
11. In February 1987, Respondent received Sixteen Thousand Fifty-Three Dollars and Thirty-Three Cents ($16,053.33) from Eric J. Parker, representing the final payment on the Parker Mortgage. Respondent failed to deposit those funds into the money market account. Rather, it appears that he placed them in his general law office Trust account.
12. Respondent kept a ledger for the funds held in the money market account and a ledger for funds held in his general law office Trust account. The entries in these ledgers cannot be reconciled.
13. Respondent admitted that he, as Trustee, was responsible for the preparation and filing of annual income tax returns for the subject Trust.
14. Respondent did not seasonably file tax returns for the years ending 1985 and 1986. He did not file a tax return for the Trust for the year ending in 1984, however, Respondent asserts that there was no income that year to report.
15. Despite Internal Revenue notices sent to him advising of the delinquent fiduciary returns, Respondent did not file tax returns for the years ending 1989, 1990, and 1991. Respondent urges, however, that such returns had been prepared, albeit late, by the Accountant, Bernard Weinstein.
16. Respondent loaned himself Fifteen Thousand Dollars ($15,000.00) from the childrens' Trust, and in a subsequent accounting identified the loan as "the Mayfield loan." Respondent stated that he provided a promissory note to the Trust; however, he could not provide a copy of the note. Moreover, Respondent conceded that he did not require collateral for the loan. It is impossible to determine from the records whether or not the loan was paid back; however, Respondent testified that it was repaid with interest.
17. In 1987, the Respondent made a personal loan to Mr. Weinstein in the amount of Thirteen Thousand One Hundred Fifty-Six Dollars and Fifty Cents ($13,156.50) from the childrens' Trust. He did not require a promissory note or security for the loan. Respondent testified that such loans, to be repaid with interest, were one of the basic functions of the Trustee and that the subject loan was repaid.
18. Respondent used the Trust fund to make loans to friends and to pay off his personal debt to the Crowders in the amount of Fifteen Thousand Six Hundred Six dollars ($15,606.00). It was observed that loans to "friends" were the purpose of the Trust and that it is unlikely such loans would be made to other than friends.
19. On December 12, 1985, Respondent loaned Sixteen Thousand Five Hundred Dollars ($16,500.00) from the Trust to his secretary, Ann Marie Alter, and her friend, Patricia Mansfield, to purchase their real property. Respondent did not obtain a credit check nor did Alter or Mansfield provide any type of financial statement. Respondent took back a second mortgage (hereinafter the Alter/Mansfield Mortgage), without obtaining any type of appraisal.
20. Alter and Mansfield subsequently defaulted on the mortgage. Respondent did not bring a foreclosure action or take any other action to collect on the note. Indeed, Respondent knew as early as June 1988 that the mortgage was five (5) months behind. Despite Respondent's efforts, he was unable to locate either mortgagor.
21. In March 1989, the first mortgage holder obtained a Final Judgment of Foreclosure, and a Certificate of Sale thereon was issued on June 5, 1989. Respondent did not notify Strausberg that the first mortgage had been foreclosed "out from under" the Alter/Mansfield Mortgage.

*533 22. Respondent listed the Alter/Mansfield Mortgage as an asset of the Trust in his accounting to Strausberg well after the property had been lost and the mortgage and note became valueless.
23. Respondent represented the terms of the loan to Alter and Mansfield in his July 13th letter of accounting, saying that the loan could be withdrawn after six months notice. Under the terms of the loan, however, the six months notice of withdrawal proviso was inapplicable until after December 12, 1988.
24. In May 1984, Respondent agreed with one James Hart that the latter would purchase a condominium known as "the Springs" from one Timothy Meyers for One Hundred Ten Thousand Dollars ($110,000.00), with Four Thousand Dollars ($4,000.00) down. Respondent, who represented Meyers, was to hold the Deed, apparently in Escrow, until Hart paid Meyers for his equity in the property. Hart was also to pay the first mortgage due Florida Federal Savings and Loan Association in the principal amount of Eighty-Two Thousand Dollars ($82,000.00). A second mortgage in favor of Barnett Bank encumbered the property in the sum of One Hundred Thousand Dollars ($100,000.00).
25. In March 1986, Respondent disbursed Nineteen Thousand Three Hundred Dollars ($19,300.00) from the childrens' Trust to Meyers and obtained a mortgage, but no note from Meyers for the payment ostensibly representing Meyers' equity in the property. The payment was actually Hart's responsibility under the May 1984 agreement with Meyers. In his Trust records, Respondent treats this payment as a loan to Hart.
26. Prior to making the above described payment, Respondent did not obtain an appraisal nor did he seek to obtain the outstanding balance of the mortgage due Florida Federal to determine equity in the property, if any. Respondent intended to use the mortgage as security for the Hart loan even though at that time there was no written promissory note from Hart.
27. The Florida Federal mortgage had a due on sale clause and the Barnett Bank mortgage included a nontransferable clause. Neither mortgage holder consented to the transfer of the property from Meyers to Hart, though Respondent testified he had reason to believe he would receive such consent.
28. In a letter of July 13, 1986, to Strausberg, Respondent listed a second mortgage for Twenty-One Thousand Dollars ($21,000.00) on the Springs. Respondent failed to record that mortgage which he had taken back from Meyers, ostensibly to avoid "triggering" the "due on sale" clause.
29. In a 1987 accounting, Respondent referred to the mortgage from Meyers as the "Hart" mortgage. It was listed at a value of Forty-Four Thousand One Hundred Forty-Six Dollars and Eighteen Cents ($44,146.18) which reflected an increase of Twenty-Three Thousand One Hundred Forty-Six Dollars and Eighteen Cents ($23,146.18) over the July 13, 1986 accounting.
30. Respondent knew at the time of the loan from the Trust to Hart that the combined outstanding balance of the Barnett Bank mortgage and the Florida Federal mortgage exceeded the value of the property. Respondent insists, however, that he had personal knowledge that the second mortgage was paid, simply not satisfied of record yet.
31. After March 1986, Respondent loaned Hart additional monies from the Trust. These monies were paid directly by Respondent to Florida Federal as payments due on Meyers first mortgage.
32. Respondent knew at the time he loaned the Trust funds to Hart that Hart was having difficulty making payments to Florida Federal, which payments were his obligation under the agreement with Meyers. Hart was a former client of Respondent.
33. In 1987, Florida Federal filed a foreclosure action on the Springs property, naming Meyers as a defendant.
34. Respondent accepted service for Meyers in that action and filed a notice of appearance as counsel for Meyers.

*534 35. On August 13, 1987, Respondent delivered a check for Fourteen Thousand One Hundred Forty-Six Dollars and Eighteen Cents ($14,146.18) to Florida Federal to reinstate the Meyers loan. Those monies were from the childrens' Trust, paid from Respondent's general law office Trust account, not from the money market account.
36. On September 17, 1987, over a year from the Nineteen Thousand Three Hundred Dollars ($19,300.00) payment to Meyers, Respondent, as Trustee, obtained a promissory note from Hart for Forty-One Thousand Six Hundred Eighteen Dollars and Seventy-Five Cents ($41,618.75), at 12 percent per annum. Although two versions of the note were executed by Hart, Respondent maintained that the operable note included a demand provision and a provision that Hart make the first mortgage payments to Florida Federal.
37. Respondent failed to inform Strausberg of the foreclosure action initiated by Florida Federal in 1987 and failed to explain that more monies from the Trust were going to pay the Meyers loan to Florida Federal with no increase in the collateral for the Hart loan.
38. The year end account on the Hart mortgage in 1987 showed Forty-Four Thousand One Hundred Forty-Six Dollars and Eighteen Cents ($44,146.18), reflecting an increase of Thirteen Thousand One Hundred Forty-Six Dollars and Eighteen Cents ($13,146.18).
39. Respondent received numerous notices, including a Claim of Lien, putting him on notice that the assessment and maintenance fees of the Springs property were not being paid.
40. In a letter to Strausberg of July 1989, Respondent listed the Hart mortgage value at Fifty-Six Thousand Three Hundred Twenty-Six Dollars and Seventy Cents ($56,326.70), an increase of Twelve Thousand One Hundred Eighty Dollars and Fifty-Two Cents ($12,180.52) over the 1987 accounting. He also stated there was Seventeen Thousand Six Hundred Seventy-Seven Dollars and Sixty-Six Cents ($17,677.66) cash in the Trust. The money market account statement, however, showed a beginning balance on June 30, 1989, of Four Thousand Six Hundred Ninety-Nine Dollars and Ninety-Eight Cents ($4,699.98) and an ending balance on July 31, 1989, as Four Thousand Seven Hundred Twenty-Three Dollars and Forty-Six Cents ($4,723.46), with no deposits or withdrawals. The client ledger for the Trust for the year 1989 did not indicate a balance of Seventeen Thousand Six Hundred Seventy-Seven Dollars and Sixty-Six Cents ($17,677.66) at any time.
41. In the 1989 accounting, Respondent promised to liquidate the Trust assets and invest in zero coupon bonds. Respondent knew that the cash in the Trust had been depleted, the Alter/Mansfield Mortgage rendered valueless and that the loan to Hart was in default.
42. Respondent wrote Hart a letter dated May 22, 1991, indicating that Hart owed him a debt which at the end of the month totaled One Hundred Twenty-Three Thousand Three Hundred Twelve Dollars and Fifty-Seven Cents ($123,312.57).
43. In August 1981, Respondent sold the Springs property for Meyers, without an appraisal, at a price at which the Trust obtained no benefit from the sale.
44. Respondent has been unable to account for all funds withdrawn from the childrens' Trust.
. . . .

COUNT III
51. In mid 1990, Strausberg retained Respondent to write letters of demand to one Gary Monieson, concerning an unpaid loan. He told Respondent he wanted to claim a bad debt reduction on his personal income tax.
52. Strausberg requested that Respondent send the information directly to his accountant, that he might claim the deduction on his 1990 tax return.
53. Strausberg had difficulty contacting the Respondent in 1991 and stated that Respondent told him he had sent the information when he had in fact not done so.

*535 54. Respondent did not forward the information to the accountant until April 10, 1992. At that time, Strausberg had already filed his tax return and did not wish to amend it, lest it trigger an audit by the Internal Revenue Service. Strausberg was unable to use the deduction for any subsequent tax years.
55. Respondent's failure to seasonably provide the information to the accountant resulted in substantial tax benefits being lost by Strausberg.
. . . .

COUNT V
59. In 1989, Dr. Matthew Seibel hired Respondent to serve as co-counsel in probating his great-aunt's estate. Respondent had handled several legal matters from Seibel over the years and they had become close personal friends. Indeed, Respondent, Seibel, Strausberg, and their families often travelled, visited, and socialized together.
60. In April 1989, Respondent asked Seibel to loan him Thirty-Five Thousand Dollars ($35,000.00) for personal reasons. Seibel loaned him the money. Respondent did not put the terms of the loan in writing, nor did he advise Seibel to seek independent counsel or give him the opportunity to do so. Respondent did not request Seibel to consent to the loan in writing nor did Seibel so consent. Respondent argues that Seibel consented in writing by signing the check. The discussion between Respondent and Seibel concerning the loan fanned [sic] approximately one and one-half minutes, and took place in a car.
61. As security for the loan, Respondent assigned to Seibel a mortgage he was holding from one Waisman.
62. At the time of this loan, Seibel considered Respondent to be his friend and attorney, and he trusted Respondent to act in his best interest.
63. In the fall of 1990, Respondent indicated to Seibel that he needed to purchase certain property. Respondent asked Seibel for another loan prior to repayment of the Thirty-Five Thousand Dollar ($35,000.00) loan. That loan, however, was repaid.
64. Seibel, not having much ready cash, obtained a bank loan and then loaned Respondent Thirty-Three Thousand Nine Hundred Eleven Dollars and Fifty Cents ($33,911.50). Seibel testified that Respondent advised he would get all of his money back plus interest or dividends. The discussion concerning the terms of the Thirty-Three Thousand Nine Hundred Eleven Dollars and Fifty Cents ($33,911.50) loan, like the other one, took less than a minute and a half. Respondent told Seibel what he needed the money for, and Seibel relied upon his representations.
65. Respondent did not put the terms of the loan in writing, did not give Seibel the opportunity to seek advice of independent counsel, and did not request Seibel to consent to the loan in writing, nor was Seibel's consent ever reduced to writing. Respondent asserts that he began telling Seibel of his right to independent legal advice but was "brushed aside" and told, in effect, that such would be unnecessary.
66. Respondent used the Thirty-Three Thousand Nine Hundred Eleven Dollars and Fifty Cents ($33,911.50) to purchase property in the name of one of his companies, which Seibel claims he later learned was solely owned by Respondent.
67. The testimony is unclear as to whether or not at the time of the loan Respondent provided Seibel with a promissory note. It is uncontroverted, however, that at some point Respondent did provide Seibel with a note for the Thirty-Three Thousand Nine Hundred Eleven Dollars and Fifty Cents ($33,911.50).
68. Seibel sought repayment of the loan; however, his repeated requests for payment were futile. Respondent filed in Bankruptcy and scheduled this loan as one of the debts to be discharged.
69. In 1991, Respondent approached Seibel about a real estate venture involving investment in rental property known as the "Oak Lane Property." Testimony is unclear as to whether Respondent and Seibel were to purchase the property as partners and also as to whether Respondent *536 disclosed to Seibel that the subject property was being purchased from Respondent. It is clear, however, the Respondent owned the Oak Lane Property and that he conveyed that property to Seibel by Deed dated February 20, 1991. At the time of the conveyance, the subject property was encumbered by a first mortgage.
70. Seibel believed the Respondent inflated the value of the property in order to induce him to enter into the venture, which Respondent vehemently denies.
71. After the property was purchased by Seibel, he refinanced it. Seibel claims he refinanced the mortgage because Respondent represented that the original mortgagee was calling its loan.
72. Over a period of time, Seibel paid Respondent in excess of Twelve Thousand Five Hundred Dollars ($12,500.00) toward repairs and renovations to the Oak Lane Property. Respondent claims to have paid in the same amount, and that such funds were then expended for repairs and maintenance to the Oak Lane Property.
73. In 1992, Seibel requested an accounting of the real estate venture from Respondent; however, Respondent failed to respond to the request.
74. In the fall of 1992, Seibel received a notice from the mortgagee that the mortgage was in arrears. Respondent represented that it was a bank error and that he (Respondent) would take care of the matter. Thereafter, Respondent falsely represented that he had indeed taken care of the matter; however, he had done nothing.
75. At the time Seibel actually viewed the Oak Lane Property, he judged it to be in very poor condition and that it did not appear to have had any renovations such as indicated by Respondent. Respondent asserts, however, that Seibel admitted that he was unfamiliar with the nature of rental properties or the standards of maintenance, and that his background and circumstances were attuned to more refined residences.
76. Seibel sold the Oak Lane Property in an attempt to recoup some of his losses. Respondent maintained that Seibel panicked in selling the property and that if he had held on to it he would have realized a profit.
The referee recommended that Maynard be found guilty of violating rule 5-104(A) of the former Code of Professional Responsibility for entering into a business transaction with a client wherein they have differing interests and where the client expects the lawyer to exercise his or her professional judgment for the protection of the client. The referee also found violations of the following Rules Regulating The Florida Bar: 4-1.4(a) for failing to keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information; 4-1.4(b) for failing to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representations; 4-1.7(a) for representing a client where that representation will be directly adverse to the interest of another client; 4-1.7(b) for representing a client where the lawyer's exercise of independent professional judgment in the representation may be materially limited by the lawyer's responsibility to another client or to a third person or by the lawyer's own interest; 4-1.7(c) for representing multiple clients in a single matter without explaining the implications of the common representation and the advantages and risks involved; 4-1.8(a) for entering into a business transaction with a client or knowingly acquiring an ownership, possessory, security, or other pecuniary interest adverse to the client; 4-1.8(b) for using information relating to the representation of a client to the disadvantage of the client; 4-1.15(a) for commingling; 4-2.1 for failing to exercise independent professional judgment and render candid advice in representing a client; 4-8.4(c) for engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; 5-1.1 for using trust funds for purposes other than those for which they were entrusted to him; and 5-1.2 for failing to follow the minimum trust accounting procedures and maintain the minimum trust accounting records. The referee recommended a ninety-one-day suspension and also assessed all costs against Maynard, which amounted to $7,264.80 according to the Bar counsel's amended affidavit.
*537 The Bar contends that the misconduct found by the referee warrants disbarment. On cross-appeal, Maynard contends that in determining that he had failed to provide Strausberg's accountant with the necessary correspondence regarding an uncollectible loan, the referee relied solely upon hearsay in Strausberg's testimony that was not subject to cross-examination. Maynard argues that this testimony does not constitute competent substantial evidence to support the referee's finding. However, in disciplinary cases, hearsay evidence is admissible, particularly where its credibility is established. Florida Bar v. Vannier, 498 So.2d 896, 898 (Fla.1986). Here, Strausberg's testimony was corroborated by a 1992 letter from Maynard to Strausberg's accountant containing information that he would have needed to claim the bad debt deduction for Strausberg.
Maynard also attacks the referee's denial of Maynard's motion in limine in which he alleged that the Bar had failed to return all of the trust account records he produced. However, before ruling on Maynard's motion, the referee heard testimony from the paralegal who supervised the copying of the trust account records and the staff investigator who delivered them. After permitting Maynard to review the records to determine which, if any, were missing, the referee denied the motion. Nevertheless, he specifically stated that he would permit Maynard to raise the same issues again as they became relevant. When the Bar subsequently introduced three of Maynard's trust account records, he made no objection that they were incomplete. We find no abuse of discretion.

CASE NUMBER 84,648
The Bar charged Maynard with nine counts of misconduct. The referee found him guilty of only count V and made the following findings:

COUNT V

CONFLICT OF INTEREST AND MISAPPROPRIATION
A. PURCHASE OF JEEP FROM A.D. AND ASSOCIATES, INC.
34. In or around November 1992, respondent indicated to Groth [a client] that he had a corporation which had a 1989 Jeep and that he needed to get it out of the name of the corporation. Respondent requested Groth do him a "favor" and purchase the Jeep for $6,000.00, which would be titled in her name.
35. The discussion between Respondent and Groth regarding the Jeep took approximately two or three minutes. He told her that she was getting the Jeep at a price far less than what it was worth, and she relied on his representation.
36. Respondent did not provide Groth with an appraisal of the Jeep which indicated its fair market value or the mechanical condition of the vehicle. He testified that he did not suggest Groth have a mechanic look at the Jeep to determine its condition and that she did not care what condition it was in as she was purchasing the Jeep as a favor to him. Moreover, Respondent was to retain use and possession of the Jeep and repurchase it at some point.
37. Respondent contends that Groth was to allow him to buy back the Jeep for $6,000.00 and that he would repay her in credit for legal fees. Respondent testified that Groth agreed to this. However, Groth denied there was ever such an arrangement.
38. Groth agreed to purchase the Jeep from the corporation and respondent wrote check number 1023, dated November 19, 1992, for $6,000.00 payable to "John L. Maynard, trustee" from the funds he still maintained in his law firm trust account on her behalf.
39. The Jeep was owned by A.D. and Associates, Inc., in which Respondent had an interest. At the time of the purchase by Groth, Respondent was president of the corporation.
40. Groth maintains that prior to his corporation selling the Jeep to her, Respondent did not disclose to her his interest in A.D. and Associates, Inc. Respondent urges that they had discussed that he and Donnie, his wife, owned the corporation.

*538 41. Respondent's trust account client ledger indicates that he attributed the $6,000.00 to A.D. and Associates, Inc., and not to his operating account. According to his client ledger record for A.D. and Associates, Inc., between November 19, 1992 (the date of the loan), and December 23, 1992, he disbursed a portion of said funds to pay his personal debts.
42. After the sale, Respondent retained control and possession of the Jeep.
43. Respondent did not advise Groth to seek independent legal advice about the transaction nor did he obtain her consent in writing to the transaction as required by R.Regulating Fla.Bar 4-1.8. He did not put the terms of the transaction regarding the Jeep in writing or ensure that the terms were fair and reasonable to her.
44. During the hearing, Respondent noted that at the time he sold the vehicle to Groth it was worth between $11,000.00 and $12,000.00 and that he only repaid her $6,000.00.
45. Respondent attempted to sell the Jeep to several persons. In 1993, he received payments on the Jeep from Mr. John Garlic and relinquished possession of the Jeep to him. At the time he relinquished the Jeep to Garlic, Respondent had not repaid Groth. Garlic later returned the Jeep as he could not pay for it.
46. Respondent later proposed leasing or selling the Jeep to Equity Funding Sources, Inc., a corporation which was owned by Stephen Woerner. Respondent gave possession of the Jeep to Woerner and received a payment from Woerner.
47. By letter dated November 24, 1993, Groth's attorney, Harry Anderson, asked Respondent to give Groth possession of the Jeep. Respondent refused to turn over the Jeep to Groth and testified that he had paid her back for the Jeep by subtracting his legal fees from the amount owed for the Jeep.
48. Respondent's client ledger for the Groth Sale to Levy indicates that on January 1, 1993, he wrote check no. 1069 in the amount of $532.85 from funds held on Groth's behalf in his general law office trust account with the notation "to Earl K. WoodGroth (Jeep)." In his reconciliation statement of his law office trust account, Respondent refers to said amount as "Transfer Taxes."
49. Sometime after November 1993, Groth filed a stolen vehicle report, and in March 1994, the Jeep was recovered by the police from Stephen Woerner.
50. Woerner agreed that he or his corporation had sought to purchase the Jeep from Respondent and that he or his corporation had made a payment on the Jeep to the Respondent. He testified that at the time Respondent delivered the Jeep, Respondent had explained that it was owned by Groth.
51. When he was contacted by the Maitland Police Department regarding ownership of the Jeep, Woerner filled out a statement and indicated that Respondent had told him that Respondent still owed Groth $8,000.00 on the Jeep. Woerner had a copy of Groth's license and registration as evidence that he was authorized to have possession of the Jeep. Respondent testified that what he said to Woerner was that he had paid a cumulative value of $8,000.00 for the Jeep and that the Jeep was his.
B. LOAN TO A.D. AND ASSOCIATES DEVELOPMENT, INC.
52. About February of 1993, Respondent discussed with Groth a transaction wherein his corporate client A.D. and Associates Development, Inc., had a contract to sell a home it owned in west Orlando to a third party for $35,000.00. He suggested Groth invest $20,000.00 in the deal.
53. A.D. Development was a development company which Respondent incorporated and envisioned he would one day own. At the time of this transaction, the corporation was owned by his brother as trustee for his mother, and Respondent was the president.
54. Respondent told Groth the money would be repaid by A.D. Development upon the sale of the west Orlando property and that the corporation would split the net proceeds with her. Alternately, she would receive 12% interest on her money if the deal "fell through."

*539 55. Respondent did not provide Groth with an appraisal of the property, but claims he provided her with something better, "an executed contract."
56. Respondent testified that he reviewed the A.D. Developments sales contract with Groth and that he explained to her that he needed $20,000.00 for living expenses. He also claimed Groth knew he had filed for bankruptcy in January 1993.
57. Groth disputes Respondent's testimony that he told her the $20,000.00 would actually be used by him as a personal loan. She testified that Respondent recommended she invest certain funds from her Trust by loaning $20,000.00 to his corporate client, A.D. Development. Her understanding was that it would either be a loan to the company at an interest rate of 12% for a period of ninety days or she would share in the profits. She really wasn't sure which.
58. Groth testified that she was reluctant to enter into this transaction, but that Respondent indicated she would be "crazy" not to take part in the deal since she could make a substantial profit. Groth testified that based upon Respondent's advice and representations, she authorized him taking $20,000.00 from her Intervivos Trust.
59. Respondent on February 12, 1993, had $20,000.00 transferred from the Money Market Account into his law office trust account, rather than to his own personal banking account or his operating account for the law firm.
60. Respondent testified that after the contract fell through, Groth wanted him to guarantee the debt and pay her 12 percent. He agreed to do this, and it was at that point that the transaction turned from being an investment by Groth into a loan.
61. In his accountings presented at the hearing, the transaction is characterized as a loan to A.D. Development.
62. Respondent testified that he assigned A.D. Development's sales contract to Groth as security for the money. Groth disputes Respondent's contention. In any event, the monies were repaid in full with interest.
63. Respondent did not put the terms of the A.D. Development transaction in writing nor did he advise Groth to seek independent legal advice about the transaction. He did not obtain Groth's consent in writing to the transaction. Further, he did not ensure that the terms of the transaction were fair and reasonable to her.
The referee recommended that Maynard be found guilty of violating rules 4-1.7(b) and 4-1.8(a) of the Rules Regulating The Florida Bar. He recommended a ninety-day suspension to run concurrently with the suspension in case number 83,918. The referee also assessed all costs against Maynard, which the Bar's counsel has calculated to be $1,835.50.
In this appeal the Bar contends that the respondent was guilty of misconduct as charged in count VIII. The referee's findings with respect to this count were as follows:

COUNT VIII

CANDOR TO THE TRIBUNAL
75. In or around January 1993, Respondent filed a Chapter 7 bankruptcy petition in the Middle District of Florida, Orlando Division, Case No. 93-00211-7-BK C.
76. On or about March 23, 1994, Respondent testified under oath before the bankruptcy court that Groth loaned him, as an individual, $20,000.00 and that he deposited the money into his law firm's operating account.
77. In the bankruptcy proceeding, Respondent testified that he used the $20,000.00 to pay his living expenses and that the funds were not due him for any legal fees. However, he testified during these proceedings that the transaction did not start off as a loan to him but that he always was morally responsible for it rather than legally responsible for it.
78. Respondent admitted that he failed to tell the bankruptcy court during the March 23, 1994, hearing that A.D. Development was obligated to repay the funds to Groth. He later clarified the matter with the court.

*540 79. Respondent testified during the hearing that he owned the Jeep which Groth had purchased from A.D. and Associates, Inc., as he had immediately repurchased it from her for himself, not his corporation. In a letter dated April 28, 1994, Respondent alleged that the Jeep was sold to him by Groth immediately after she had purchased it from A.D. and Associates, Inc., on December 19, 1992. He also alleged in the letter that he paid Groth in full for the Jeep. He still maintains that he did.
80. Respondent did not list the Jeep as an asset on his January 1993, bankruptcy petition schedule of personal property of the bankruptcy proceeding. He testified that he listed the stock of A.D. and Associates, Inc., on his petition, which is contrary to his position that he was the owner of the Jeep, not the corporation.
We agree with the Bar that the referee's own findings in Count VIII demonstrate that Maynard was guilty of violating rule 4-3.3(a)(1) for knowingly making a false statement to a tribunal and rule 4-8.4(c) for engaging in conduct involving fraud, dishonesty, deceit, or misrepresentation.[2]

DISCIPLINE
We turn at last to the Bar's challenge to the referee's recommended discipline. Our scope of review in this area is broad because it is we who bear the ultimate responsibility to order an appropriate sanction in attorney disciplinary cases. Florida Bar v. Anderson, 538 So.2d 852, 854 (Fla. 1989). As we have stated before, discipline must serve three purposes:
First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in like violations.
Florida Bar v. Lord, 433 So.2d 983, 986 (Fla.1983) (emphasis and citations omitted).
Disbarment is presumed to be the appropriate punishment when a lawyer has misused client funds. Florida Bar v. Shanzer, 572 So.2d 1382, 1383 (Fla.1991). Mitigating evidence may rebut this presumption, leading to the lesser punishment of suspension. Id. Although Maynard did not have an opportunity to present mitigating evidence in case number 83,918,[3] we need not remand this cause for an evidentiary hearing on the issue of mitigation. Maynard had the opportunity to present mitigating evidence in case number 84,648 and he did not do so. In any event, we find the mitigating circumstances which Maynard alludes to in his reply brief[4] insufficient to overcome the aggravating circumstances that we find here. Maynard received a two-month suspension in 1979 for trust account record-keeping violations. Adding to this the severity and number of violations here and the lengthy period of time over which these violations occurred, we find the concurrent ninety- and ninety-one-day suspensions are grossly inadequate. Such lenient discipline does not serve any of the purposes set forth above. We conclude that disbarment is the only appropriate punishment.
John Lobban Maynard is hereby disbarred. The disbarment will be effective *541 thirty days from the filing of this opinion so that Maynard can close out his practice and protect the interests of existing clients. If Maynard notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the disbarment effective immediately. Maynard shall accept no new business from the date this opinion is filed. Further, Maynard shall make restitution to Strausberg and Seibel. Judgment for costs in the amount of $9,100.30 is entered in favor of The Florida Bar and against John Lobban Maynard, for which sum let execution issue.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] The referee found Maynard not guilty of two other counts.
[2] We reject the Bar's contention that the referee's findings on Counts III and VI also mandated the conclusion that Maynard was guilty of ethical violations.
[3] Upon the Bar's motion, the referee issued an order consolidating the two cases for the purpose of holding one hearing on the issue of discipline. Accordingly, at the close of the evidentiary hearing in case number 83,918, the referee indicated that he would defer any recommendations of discipline in his official report until after the hearing in case number 84,648, and then hear the disciplinary portion of both cases together. Instead, the referee's report in case number 83,918 contained a suspension recommendation without any explanation as to why the referee did postpone his recommendation of discipline.
[4] Maynard mentions his lack of bad motive, alcohol abuse and subsequent rehabilitation, and the sophisticated nature of his clients in financial and investment matters.